IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EUNICE J. ELLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:06-cv-251-MJR |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

### REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Judge Michael J. Reagan pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the Petition for Review of the Commissioner's Decision Denying Benefits filed by Eunice J. Ellis ("Plaintiff") on March 27, 2006 (Doc. 1). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's petition be **DENIED**, that **JUDGMENT** be entered in favor of the Commissioner, and that the Court adopt the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB"), Disabled Widow's Insurance Benefits ("DWIB"), and Social Security Income ("SSI") on July 29, 2003, alleging an onset date of May 28, 2003 (Tr. 51-53, 211-13). Her claim was denied initially and on reconsideration (Tr. 22-26, 214-22). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 14, 2005 (Tr. 14). After the hearing, the ALJ issued an unfavorable decision on September 3, 2005 (Tr. 19). On February 6, 2006, the ALJ's decision became the

Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 4-6).

Plaintiff filed this suit in the U.S. District Court for the Southern District of Illinois on March 27, 2006 (Doc. 1). Plaintiff argues that the ALJ's determination that she could perform light work is not supported by substantial evidence.

## SUBSTANTIVE HISTORY

**Medical History**

Plaintiff was 55 years old at the time of the hearing and had completed her GED (Tr. 243-44). Her past work included work as a sales clerk, an assistant microfilm clerk, and a home healthcare aide (Tr. 245-46).

On November 3, 2000, Plaintiff complained to Dr. Janet Robinson, her treating physician, that she hurt her back lifting boxes (Tr. 157). Dr. Robinson's physical examination of Plaintiff revealed tightness in her back, with tenderness and swelling in the muscles along her spine (Tr. 157).

On February 1, 2001, Plaintiff complained of "joint pains [from] her usual arthritis"(Tr. 152). On September 19, 2001, she again complained of back pain, reporting to staff at Murphysboro Health Center that pain from her shoulder had extended to her back (Tr. 136). A physical examination again revealed tightness and tenderness in the muscles along her spine (Tr. 136).

On December 20, 2001, an MRI revealed a bulging disc at the L5-S1 and mild dessication at the bottom of her spine (Tr. 132, 133). When Plaintiff reported that the pain had not improved on January 18, 2002, Dr. Robinson prescribed a TENS unit (Tr. 130, 131). Plaintiff continued to receive medication for chronic back pain and, in August 2002, informed

Dr. Robinson that she had back pain all the time (Tr. 119, 121, 123-25, 129).  An examination on August 21, 2002 revealed tenderness in her lower back, and limited range of motion (Tr. 120).  In both October and November 2002, Plaintiff indicated that her back pain had increased, although she was still using the TENS unit and doing exercises for her lower back (Tr. 117-18).

On March 12, 2003, Plaintiff told Dr. Robinson that her lower back pain had increased (Tr. 116).  A physical examination revealed tenderness in the L5 area, and that she could not fully flex forward (Tr. 116).  Dr. Robinson wrote a note stating that Plaintiff was unable to work at that time due to degenerative disc disease (Tr. 115).  An MRI taken on March 28, 2003 showed normal alignment of the spine, but a narrowing of the L5-S1 disc space with disc protrusion, and evidence of mild arthritis at the L4-L5 area (Tr. 112A).  There were no other bulges, no disc herniations, and no spinal stenosis (Tr. 112A).

On June 20, 2003, Dr. Robinson referred Plaintiff to Dr. Sumeer Lal, a neurological surgeon (Tr. 98, 116).  Dr. Lal noted that Plaintiff had signs and symptoms of low back pain and neurologically-based lameness (Tr. 98).  Dr. Lal also observed that Plaintiff did not appear very comfortable (Tr. 98).  A physical examination revealed difficulty ambulating and a limited range of motion in her back (Tr. 98).  However, she had no motor or sensory deficits (Tr. 98).  After reviewing her MRI results, Dr. Lal concluded that, in addition to the bulging disk, she had a "fairly significant disc collapse" at the L5-S1 level, and narrowing of the spinal canal at the L4-L5 level (Tr. 98).  He recommended epidural steroid injections, and stated that if the injections did not produce relief, it would be necessary to consider back surgery (Tr. 98).

On September 24, 2003, Dr. Clement Gotway reviewed the evidence of record for the Illinois Disability Determination Service and completed an assessment of Plaintiff's physical residual functional capacity (Tr. 90-97).  He concluded that she retained the residual functional

capacity to perform light work (lifting 20 pounds occasionally and 10 pounds frequently, and sitting or standing/walking for a total of six hours in an eight-hour day), but could only occasionally engage in postural activities such as climbing, balancing, stooping, kneeling, crouching, or crawling (Tr. 91-92).  Dr. Gotway explained that the results of tests and physical examinations showed degenerative disc disease and revealed difficulty ambulating and limited range of motion, but that Plaintiff had no motor or sensory deficits.

On December 5, 2003, Plaintiff returned to Dr. Robinson and reported back pain that she rated at 9 on a scale of 1 to 10 (Tr. 102).  On January 1, 2004, she told Dr. Robinson that the cold weather was making her hurt all over (Tr. 101).  A physical examination revealed tightness and tenderness in the muscles along her lower spine (Tr. 101).

On February 19, 2004, Dr. Robinson noted that Plaintiff had stopped taking the medication prescribed for her hypertension and recommended that she resume taking it (Tr. 186). At a follow-up visit on March 4, 2004, Plaintiff rated her level of pain "very high" (Tr. 185).  On April 2, 2004, after Plaintiff complained that her back pain was worse, Dr. Robinson adjusted her medication (Tr. 184).  On March 4, 2004,  Dr. Arnaldo Carvalho reviewed the evidence of record and confirmed Dr. Gotway's September 2003 opinion that Plaintiff retained the residual functional capacity for light work (Tr. 97).

On June 17, 2004, staff at the Murphysboro Health Center performed a carotid sonogram after Plaintiff complained intermittent facial numbness (Tr. 183, 191-92).  It revealed mild hardening of the right carotid arteries and mild to moderate hardening in the left (Tr. 191-92).  A chest x-ray, taken on September 28, 2004, after she complained of shortness of breath, revealed no acute problems, no airspace abnormalities, and no changes from previous studies (Tr. 187, 189).

Dr. Maddie M. Chammness became Plaintiff's treating physician by September 2004 (Tr. 181, 204). On October 11, 2004, Dr. Chammness noted that she was obese, and continued to have high cholesterol and hypertension (Tr. 180). Plaintiff complained that her back pain became worse when she sat for long periods of time, and that the pain prevented her from bending over (Tr. 180). On October 29, 2004, Plaintiff complained that her pain medications did not provide relief, and that she sometimes experienced numbness in her hands and feet (Tr. 179). Dr. Chammness prescribed the analgesic Darvocet, and recommended pain management therapy (Tr. 179). Plaintiff did not return to see Dr. Chammness until March 29, 2005, at which time Dr. Chammness noted that she had not kept her pain management appointment (Tr. 178). Dr. Chammness noted no changes in her condition (Tr. 178).

On April 19, 2005, Plaintiff asked Dr. Chammness to order an MRI, because her pain was worse and she was having trouble sitting (Tr. 177). The MRI of her lower back, taken on April 28, 2005, revealed normal vertebral bodies and nerve roots, a broad-based disk bulge at the L5-S1 level, and mild foraminal narrowing at the L4-L5 level, but no evidence of spinal stenosis (Tr. 171). When she discussed the MRI results with Dr. Chammness on May 10, 2005, she reported that she could not walk well because of her lower back pain (Tr. 175).

**Hearing Testimony**

Both Plaintiff and a vocational expert, Dr. John Grenfell, testified at the hearing. In response to questions posed by the ALJ, Plaintiff testified that she had not worked since May 23, 2003 (Tr. 243). She testified that she lived with her son and granddaughter (Tr. 243). She testified that she obtained her GED in 1976 (Tr. 244). She testified that she had no problem with reading, spelling, or general math and that she had no vocational training (Tr. 244).

Plaintiff further testified that she had worked as a nurse's aide, but was never certified as

a CNA (Tr. 244). She also testified that, before working as a nurse's aide, she worked as a sales clerk at a gas station/convenience store. She testified that her work as a sales clerk entailed stocking vending machines, unloading from trucks cases of oil, antifreeze, and windshield solvent, and stacking those cases in the back of the station (Tr. 245). She stated that the heaviest thing she lifted on that job was about 55 pounds (Tr. 245). She next testified that she worked as an assistant microfilm clerk from 1995 to 2002 and lifted up to 60 pounds in that position (Tr. 246). She then testified that her last job was that of a home healthcare assistant, which entailed lifting patients in and out of bed, changing sheets, and doing laundry (Tr. 246). At that job, she lifted up to 125 pounds (Tr. 246-47).

Plaintiff testified that she was unable to work because she could not stand and could not sit for long periods without losing feeling in her legs (Tr. 247). She testified that her back impairments were the cause of those symptoms (Tr. 247). She testified that she had been diagnosed with depression years before, and that symptoms from that diagnosis had resurfaced to limit her ability to do things for herself (Tr. 247).

Plaintiff next testified that her granddaughters cooked, washed dishes, did laundry, and cleaned the house instead of her (Tr. 248). She testified that she went grocery shopping with her granddaughter (Tr. 248). She also testified that she did not have a driver's license and had not had one since 2000, when she had a DWI conviction (Tr. 248-49). She testified further that she no longer drank alcohol and that her appetite for food was typically poor (Tr. 249).

Plaintiff testified that she had problems with walking, explaining that she lacked the endurance and stamina for walking short distances (Tr. 250). She testified that she felt uncomfortable lifting a gallon of milk and that she could only stand for about three minutes before her legs would get numb (Tr. 250). She also testified that she, at times, laid herself down

to take pressure off her hips (Tr. 250). She testified that for every hour she spent seated, she spent up to 15 minutes laying down (Tr. 251).

Plaintiff then testified that she did not visit people outside of her home or go out to movies or picnics (Tr. 251). She testified that she had no hobbies, was not a member of any clubs, organizations, or churches, and did very little reading in the course of a day (Tr. 251).

In response to questions posed by her attorney, Plaintiff testified that she experienced a pain level of 10 during the hearing, with 10 representing the worst pain (Tr. 252). She testified that the pain registered at that level in her lower back and hips for about 75 per cent of each day (Tr. 252). She testified further that she tried to alleviate the pain by taking prescription pain killers two to three times per day, but that those medications did not work well (Tr. 252-53). She testified further that she experienced pain seven days per week (Tr. 254). She testified further that she had arthritis in her knees, consistently at pain level 6 or 7, which made it hard for her to stand (Tr. 255-56).

She testified that she started seeing Dr. Chammness after she took over Dr. Robinson's medical practice (Tr. 256). She testified that she wanted to undergo surgery in the future because injections were not historically effective in treating her pain (Tr. 256). She testified further that she continuously felt a terrible pain throughout her body.

In response to questions posed by the ALJ, the vocational expert testified that Plaintiff's past work as a gas station clerk was medium, semi-skilled; that her work as a microfilm clerk was heavy, unskilled; and that her work as a home health aide worker was heavy, semi-skilled (Tr. 257). He then testified that some of Plaintiff's skills were transferable to sedentary jobs, and that 25,000 such jobs existed in the regional economy (Tr. 258). He testified that 4,000 gas station clerk jobs existed in the regional economy and 30,000 office helper jobs existed in the

7

State of Illinois (Tr. 258). He testified further that 68,000 light cashier jobs and 12,000 counter worker jobs existed in the State of Illinois (Tr. 259). Next, he testified that there were a substantial number of sedentary, unskilled jobs in the State of Illinois (Tr. 259). He then testified that, if Plaintiff's pain were at level 10 for 75 per cent of the time, there would be no jobs that she could perform (Tr. 259).

**The ALJ's Findings and Conclusions**

Pursuant to Step 1 of the five-step sequential evaluation, the ALJ found that claimant was not engaged in substantial gainful activity (Tr. 18). In Step 2, the ALJ found that Plaintiff had the severe disabilities of degenerative disc disease, obesity, and poorly controlled hypertension (Tr. 18). In Step 3, the ALJ found that Plaintiff's impairments did not meet or equal listed impairments in Appendix 1 (Tr. 18). The ALJ found in Step 4 that Plaintiff's impairment prevented her from performing his past relevant work (Tr. 18). In the fifth and final step, the ALJ found that Plaintiff could perform a significant range of light and a full range of sedentary work, that a significant number of those jobs existed in the economy (Tr. 19). Pursuant to the foregoing evaluation, the ALJ found that Plaintiff was not under a disability and was thus ineligible for SSI or DIB (Tr. 19).

CONCLUSIONS OF LAW

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act ("Act") is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive[.]"); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2005) (stating that "the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts,

reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility"). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 101 (1938)).  See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. See Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  This deferential standard applies to credibility findings as well as RFC findings. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations generally will not be overturned unless they were patently wrong.").  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986) (clarifying that the ALJ must articulate "at some minimal level his analysis of the evidence"); Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004) (stating that "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws").

   Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Act.  The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. § 416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in

substantial gainful activity." 20 C.F.R. § 416.920(c). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits ... physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 ("Appendix 1"). 20 C.F.R. § 401, pt. 404, subpt. P, app. 1. If it does, then the Commissioner acknowledges that the impairment is conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. § 416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Plaintiff argues that the ALJ's RFC determination is not based upon substantial evidence because it does not consider the amount of weight she could lift or the length of time she could stand, work, or sit. The Commissioner argues that the ALJ's RFC finding is indeed supported by substantial evidence and should therefore be allowed to stand.

In determining a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including the claimant's own descriptions and observations of his limitations. 20 C.F.R. § 404.1545(a)(3). The reference to "other evidence" in the regulations refers to the following: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain and symptoms; (3) factors that precipitate and aggravate the claimant's symptoms; (4)

the type, dosage, and effectiveness of medications; (5) the claimant's treatment other than medication; (6) any measures the claimant has used to relieve his pain or symptoms; and (7) other factors concerning the claimants functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).

In the instant case, the ALJ properly considered the medical evidence of record and the above-listed factors in determining that Plaintiff retained an RFC of a significant range of light work and a full range of sedentary work. Certainly, the findings of Dr. Gotway and Dr. Carvalho that Plaintiff retained the functional capacity to perform light work constituted medical evidence upon which the ALJ based his RFC determination (Tr. 91-92, 97). With respect to other evidence, the ALJ called attention to the fact that all of Plaintiff's prescription-strength medications were for hypertension, asthma, and other ailments, rather than for pain (Tr. 16). The ALJ also pointed out that while Plaintiff testified that her pain registered at the highest level 75 per cent of the time, she had inexplicably stopped using the TENS unit, which, according to her statements, had reduced the pain in her back to level 4 (Tr. 17). Additionally, the ALJ found that Plaintiff's testimony as to her pain was not entirely credible. More specifically, Plaintiff complained of pain in all of her joints, but her medical records revealed that she had only mentioned such global pain on one occasion, specifying at that time that the cold weather made her ache (Tr. 17). The ALJ also pointed out that although Dr. Lal had recommended pain treatment by injection and possible surgery, Plaintiff neither followed-up on those recommendations, nor did she follow-up with Dr. Chammness for pain management therapy, which supports the inference that she did not experience severe pain 75 per cent of the time as her testimony suggested (Tr. 17).

As stated above, the ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. See Golembiewski, 322 F.3d at 915.

The ALJ here based his RFC determination on the medical evidence of record, and on numerous other factors called for in the Commissioner's regulations.  Additionally, the ALJ met the requirement of "articulating at some minimal level his analysis of the evidence." Delgado, 782 F.2d at 82.  Accordingly, the ALJ's decision should not be disturbed and Plaintiff's petition should be **DENIED**.

Because Plaintiff has failed to demonstrate that the ALJ's decision was not based on substantial evidence or that the ALJ committed an error of law, it is **RECOMMENDED** that Plaintiff's petition be **DENIED**, that **JUDGMENT** be entered in favor of the Commissioner, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have ten (10) days after service of this Recommendation to file written objections thereto.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: August 23, 2007**

                                        s/ *Donald G. Wilkerson*
                                        **DONALD G. WILKERSON**
                                        **United States Magistrate Judge**